IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GEORGIA J. CHILDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:07CV945-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Georgia J. Childs brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On August 21, 2003, plaintiff filed a protective application for Supplemental Security Income, and on October 2, 2003, she filed an application for disability insurance benefits. On June 28, 2005, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. At the hearing, plaintiff testified as follows: she was then 46 years old and has a high school degree and two years of college. She lives with her

father. She has previously worked as a day care worker, cook, machine operator for a flag manufacturing company, cashier, machine operator in a shop which made wood columns, and a substitute teacher. She cannot work now because she has had "two light strokes, and a seizure," has a problem with a disc in her neck, mitral valve prolapse, and a back problem. She uses crutches to help with her balance. She can sit for about five minutes, stand for two or three minutes. Her right side "went out on [her]" and she has problems with her nerves, which make her "feel like [she is] just crawling all over [her] whole body." She cannot lift with her right hand. She is able to lift with her left hand, but cannot lift a gallon of milk. She cannot sleep because of back pain. She gets welts on her body from her medication. She hears voices "a lot," and it has not improved with the medications prescribed by her mental health practitioner. (R. 370-78).

Dr. James Noble Anderson, a medical doctor, testified as an expert. He stated that he had reviewed plaintiff's medical record and listened to her testimony. He summarized plaintiff's physical condition as follows:

> Ms. Childs has chronic pelvic pain associated with gynecological problems, specifically ovarian cysts. She has chronic lower back pain and neck pain associated with degenerative arthritis, which is mild in nature and treated symptomatically. She has a history of mitral valve prolapse without any significant treatment. She has treating records which are mostly from a physical standpoint, which are mostly from the gynecological area treating her abdominal complaints. She has a physical examination by a Dr. Crawford, who made the physical diagnosis a history of mitral valve prolapse, hypertension, and headache disorder, and cervical and lumbar pain. His physical examination was basically normal, and this was in January of 2004.

(R. 53, 369, 379-80). Dr. Anderson expressed his opinion that plaintiff's physical condition does not meet or equal the listings for disability, and that she is "limited to a full range of

light work activities or less" and has been so limited since her alleged onset date of July of 2002. (R. 380).

Dr. Doug McKeown, a clinical psychologist, also provided expert testimony. He testified as follows:

> [Plaintiff] is currently being seen at East Central Mental Health. A first evaluation in the record is in August of 1996 by Dr. Fred George, who did intellectual testing, and found her to be functioning in the borderline range, and diagnosed panic disorder, dysthymia and somatozation. A subsequent evaluation was done for the Department by Walter Jacobs, a psychologist who did intellectual testing, and found a verbal IQ of 66, a performance IQ of 79, a full scale IQ of 69, which would suggest mild mental retardation which is a diagnosis he assigned but would be fully incongruent with the history. And also the fact that there is no indication of any issues of mental retardation prior to the age of 19. He also noted in his evaluation in February of 2004 that there was a significant history of crack cocaine usage, but he reported that the claimant indicated she had not used crack cocaine in the previous six months. Dr. Lopez had originally diagnosed the claimant with a generalized anxiety disorder in 1996. The current treatment at East Cental Mental Health is essentially with a minimal dose of an antidepressant, an SSRI antidepressant Paxil, 12.5 milligrams, and Trazodone, 100 milligrams, which would be utilized primarily to initiate sleep. The overall indications from the record would suggest a number of somatic complaints and issues that are not specifically identified in the mental health records, but primarily depressive symptomotology which would be identified under 12.04 under the affective disorders, and would be considered a non-specific depressive disorder NOS with minimal treatment apparently required from the Mental Health Center. Dr. Lopez did do a residual medical assessment of the ability to do work-related activities in June of 2005 which did suggest marked impairments in multiple areas. I can't find anything in the mental health records that supports a degree of severity of that nature. It is Dr. Lopez's signature but it is not his handwriting, and I would suspect that was filled out by a counselor who is the individual primarily seeing the claimant.[1] Under the 12.04 symptomotology, based on the treatment record and the current treatment, as well as verbal

---

[1] Dr. McKeown later testified that "[u]sually at Mental Health Centers the physicians do not fill out the forms. They sign them." (R. 384).

> psychotherapy along with medication, there is not an indication that the claimant would meet or equal a 12.04 listing. The B criteria would suggest based on the record a mild impairment of activities of daily living, perhaps moderate impairment of social functioning, and a mild impairment of concentration, persistence and pace with no episodes of decomposition noted within the past year.

(R. 54-55, 369, 380-84). Dr. McKeown expressed his opinion that plaintiff has been functioning at this level since at least 1996. (R. 383).

The ALJ rendered a decision on September 1, 2005. The ALJ concluded that plaintiff suffered from the severe impairments of "possible borderline intellectual functioning, depressive disorder NOS, chronic pelvic pain associated with ovarian cysts, [and] mild degenerative arthritis of the cervical spine." (R. 31). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform work "at the light exertional level commensurate with the capabilities of an individual who has mild impairment of activities of daily living, moderate impairment of social functioning, and mild impairment of concentration, persistence, and pace, with no episodes of decompensation noted within the past year." (Id.). He concluded that plaintiff can perform her past relevant work and, thus, that she was not disabled within the meaning of the Social Security Act. (Id.). On August 21, 2007, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### ALJ's Failure to Credit Treating Physician's Opinion

Plaintiff contends that "[t]he ALJ committed reversible error by failing to accord substantial weight to the opinion of Dr. Fernando Lopez, plaintiff's treating psychiatrist." (Doc. # 12, p. 9).[2] Plaintiff has received treatment from the East Central Mental Health

---

[2] As noted above, the ALJ concluded that plaintiff is physically able to perform work at the light exertional level. Plaintiff does not argue to the contrary. Plaintiff's medical treatment for physical problems is intermittent and minimal. She obtained gynecological treatment between July 2001 and February 2004, including a hysterectomy (due to symptomatic fibroids) and pain medication for ovarian cysts. (Exhibits 1F, 3F, 6F). Plaintiff also sought treatment in June 2003 for bronchitis and chest wall pain (R. 139-56, 172-73),

5

clinic, under Dr. Lopez's supervision, most recently since October 2003.[3] Her treatment consisted of individual sessions with counselors; Dr. Lopez evaluated plaintiff and prescribed medications. (Exhibits 8F, 11F, 12F).

On June 6, 2005, Dr. Lopez signed a mental RFC form indicating that plaintiff has a "marked" impairment of her ability to: (1) respond to customary work pressures; (2) understand, carry out, and remember instructions in a work setting; (3) respond appropriately to supervision in a work setting; and (4) perform repetitive tasks in a work setting. He indicated that plaintiff has "moderate" restrictions or deficiencies in: (1) activities

---

in July 2003 for neck pain (R. 131-38), and in September 2003 for right arm and shoulder pain (R. 123-30, 170). Plaintiff reported to her treating physician in June 2003 and to a consultative examiner in January 2004 that ER personnel told her that she had a "slipped disc" in her neck (R. 170, R. 180); however, there is no such diagnosis in the ER records. (See Exhibit 2F, including July and September 2003 cervical spine x-ray results at R. 130 (noting "mild osteoarthritic changes of the cervical spine") and R. 138 ("vertebral bodies . . . of normal vertical height and well aligned with diffuse narrowing of the C5-6 disk space but the neural foramina are open and the odontoid appears intact")). Plaintiff sought treatment in April 2004 for knee pain (R. 253-261); the examining physician diagnosed "subjective knee pain" and noted "malingering." He advised plaintiff to take Advil as needed. (R. 258). In July 2004, plaintiff sought treatment at the emergency room for neck pain, and complained of right-side weakness. She stated that she had run out of pain medication. (R. 242-52). Plaintiff was treated at the emergency room in August 2004 for a vaginal abscess (R. 309-14). In October 2004, plaintiff telephoned her physician's office, requesting Lortab for neck pain. The physician prescribed Motrin. (R. 302-04). In November 2004, plaintiff presented to the ER "with very vague + poor [history of] Rt side weakness + spasm – reoccurring – worse today[.]" A CT scan of plaintiff's brain was negative; the ER physician prescribed Ativan and released her. (R. 317-21). Plaintiff returned to the emergency room eight days later with a small abscess on her buttock. (R. 323-27). Nine days later, plaintiff returned, complaining of neck pain and a "nerve attack" which caused an "itchy, crawly" feeling on her skin. The physician noted that plaintiff requested Lortab several times during the examination. On December 4, 2004, plaintiff complained of right knee pain. An x-ray of her knee was normal, and the physician prescribed Naprosyn. In January 2005, plaintiff appeared at the ER with her "usual [complaints of] chronic knee & back pain." (R. 342). Lumbar spine x-rays in June 2005 were normal, and cervical spine x-rays showed "mild cervical spondylosis[,] minimal degenerative loss of height of the C5-C6 intervertebral disc space[, and] straightening of the usual lordosis." (R. 350). A consultative examiner did not impose any exertional limitations, concluding that plaintiff "possess[es] the usual work-related activities such as sitting, standing, walking, lifting, carrying, and handling objects." (R. 180-85). The ALJ's conclusion that plaintiff retains the exertional capacity for light work is supported by substantial evidence.

[3] Plaintiff previously received mental health treatment at the clinic in 1997. (R. 207-222).

of daily living; (2) maintaining social functioning; (3) concentration, persistence or pace; (4) her ability to respond appropriately to co-workers; and (5) her ability to perform simple tasks in a work setting. (R. 348-49).

The ALJ indicated that he gave "little weight" to the RFC form signed by Dr. Lopez. He stated:

> The assessment suggests marked impairments in multiple areas. Neither Dr. McKeown nor I can find anything in the mental health records to support that degree of severity. Dr. McKeown has worked with Dr. Lopez for years and notes that the signature on the assessment is Dr. Lopez's signature; however, the handwriting on the form is not Dr. Lopez's handwriting. Dr. McKeown suspects that the assessment was filled out by a counselor who is the individual primarily seeing Claimant.

(R. 25).

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue 2007 WL 2782051, *1 (11th Cir. Sep 26, 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F .3d 1155, 1159 (11th Cir. 2004)). The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'" Crawford, *supra* (quoting Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.1991)). Additionally,

7

there is good cause where the treating physicians' opinions are "inconsistent with their own medical records[.]" Roth, *supra* (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)).  "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

It is undisputed that Dr. Lopez signed the mental RFC form at issue.  Accordingly, the fact that the form may have been completed by plaintiff's counselor, rather than Dr. Lopez himself, does not provide an adequate basis for rejecting the opinion expressed on the form. However, the primary reason advanced by the ALJ for rejecting Dr. Lopez's opinion is that it is inconsistent with plaintiff's mental health treatment records.  As noted above, there is "good cause" to reject a treating physician's opinion where the opinion is inconsistent with the physician's own records of a claimant's treatment.

Dr. McKeown testified that the medication which Dr. Lopez prescribed for plaintiff consisted of "a minimal dose of an antidepressant, an SSRI antidepressant Paxil, 12.5 milligrams, and Trazodone, 100 milligrams, which would be utilized primarily to initiate sleep." (R. 382).  He further testified that only "minimal treatment [was] apparently required from the Mental Health Center."  (Id.).  The ALJ noted that "[t]he records from East Central Mental Health-Mental Retardation indicate that [plaintiff] has been noncompliant on several occasions and that her symptomatology has increased at those times."  (R. 27; see also ALJ's

8

summary of the evidence of plaintiff's mental health treatment at R. 21-22).

This observation is supported by substantial evidence of record. Dr. Lopez prescribed Paxil for plaintiff on February 23, 2004. (R. 270-72). On April 20, 2004, after she had been taking Paxil for almost two months, plaintiff "reported no depressive symptoms." (R. 268). Her affect was "appropriate," her mood "euthymic," her sleep and appetite "good," and her motor activity "calm." She demonstrated "normal" orientation as to person, place, time and situation, and she reported no hallucinations or delusions, and no suicidal, homicidal or paranoid thoughts. (Id.). On May 24, 2004, Dr. Lopez made the same clinical observations. The treatment notes indicate compliance with medication, and "[d]epressive episodes improved." (R. 267). On June 4, 2004, plaintiff's counselor made the same positive clinical observations, and plaintiff "reported doing well on medication, no depressive symptoms." The counselor noted compliance with medication. (R. 266). On June 18, 2004, the clinical observations were again positive. However, plaintiff "discussed an incident that occurred on last week w/ boyfriend[.] [Client] stated she became angry and lost control. . . . [Client] also reported going three days w/o meds because she forgot where she laid them. [Client] reported an increase in depressive symptoms, confusion and some memory deficit." (R. 265). In counseling sessions in July, plaintiff reported compliance with medications but increased depressive symptoms. She told the counselor that her father had told her to move out of his home, that she and her boyfriend had recently broken up, and that she was upset because her foster mother was ill. (R. 262-64). On August 27, 2004, plaintiff "presented in [her counseling] session w/ crying spells and depressed mood." She reported

9

that she was out of her medication.  On August 30, 2004, during an appointment with Dr. Lopez, plaintiff stated that she had not taken her Paxil for two months.  (R. 294-95).  Dr. Lopez again prescribed Paxil (R. 294) and, on September 21, 2004, plaintiff reported medication compliance and that she had "no present complaints."  (R. 293).  On October 6, 2004, the counselor's clinical observations were positive, and plaintiff reported improvement in her depressive symptoms.  The counselor noted that "[Client] appears stable at present."  (R. 292).  On October 15, 2004, plaintiff again reported "improvement in depressive symptoms."  (R. 291).

Plaintiff's next visit to the clinic was over three months later, on January 26, 2005.  Plaintiff reported that she was then on no medication.  (R. 288).  The counselor noted that plaintiff's "compliance with treatment has decreased since she had the 2 strokes."  (R. 289).[4]  At a counseling session on February 24, 2005, plaintiff reported that she continued to experience depressive symptoms and that she "gets samples" of medication.  She requested to be referred to Dr. Lopez for medication.  (R. 285). Treatment notes for plaintiff's subsequent visit with Dr. Lopez indicate that, although she had obtained samples of medication from Dr. Runyon, she was "non-compliant [with] appts and meds."  He again prescribed Paxil.  (R. 282).  On March 30, 2005, plaintiff's counselor noted that plaintiff's affect was appropriate, but she was mildly dysphoric.  Plaintiff reported compliance with medications.  She indicated that she continued to experience some problems, but was "doing

---

[4] As the ALJ indicated, there is no evidence of record that plaintiff has suffered two strokes.  (See ALJ's discussion at R. 26-27).

10

alright." (R. 281). On April 29, 2005, the counselor again noted appropriate affect and mild dysphoria; plaintiff again stated that she was "doing alright." (R. 280). Just over five weeks later, Dr. Lopez completed the RFC form indicating that plaintiff has "marked" impairment of her ability to: (1) respond to customary work pressures; (2) understand, carry out, and remember instructions in a work setting; (3) respond appropriately to supervision in a work setting; and (4) perform repetitive tasks in a work setting, and "moderate" impairment in all other listed areas. (R. 348-49).

As the Commissioner argues, "the contemporaneous treatment records from the Clinic reveal that Plaintiff's depression was largely controlled with no more than a minimal dosage of Paxil." (Doc. # 17, p. 8). Accordingly, the ALJ has shown good cause for his decision not to give substantial weight to Dr. Lopez's opinion as expressed in the mental RFC form. See Gibbs v. Barnhart, 130 Fed. Appx. 426, 431 (11th Cir. 2005)("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.")(quoting Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988).[5]

### ALJ's Failure to Comply with HALLEX Guidance

Plaintiff asserts that the ALJ erred by relying on an internet study to support his conclusion that plaintiff's cervical degenerative disc disease is "almost a 'normal' part of our

---

[5] Because the ALJ properly discredited Dr. Lopez's opinion, he did not err by relying on the contrary opinions of the non-examining psychologists. See Milner v. Barnhart, 275 Fed. Appx. 947 (11th Cir. 2008)(unpublished opinion).

aging process." (Plaintiff's brief, p. 11; see R. 26[6]). Plaintiff indicates that this is "not necessarily a legal error" but that it was contrary to the guidance in the Hearings Appeals and Litigation Law Manual (HALLEX), specifically HALLEX I-2-8-25D. This section provides:

> The ALJ must not cite medical text and medical publications as an authority for resolving any issues. If it is necessary to refer to a medical text or medical publication, that ALJ must submit the material to the claimant or the representative for review and comment, and make the material a part of the record.

(Plaintiff's brief, p. 11; HALLEX I-2-8-25D).[7] Plaintiff argues that the ALJ erred by relying on the internet study, and by failing to include it in the record and submit it to plaintiff for review. The Commissioner responds that, even assuming that the ALJ violated the decision-writing procedures outlined in the HALLEX manual, plaintiff has not established that remand is warranted because she has shown no prejudice.

The Eleventh Circuit has not addressed whether an ALJ's violation of the guidance set forth in the HALLEX is grounds for remand. See Mullis v. Astrue, 2008 WL 4452343,

---

[6] The ALJ states, "There is no current evidence to support Claimant's allegations of slipped discs in neck and back, a ruptured disc affecting neck and back, pinched nerve, poor circulation on right side due to neck and back injury, uncontrollable shaking in right hand and arm, severe headaches, can only stand for a short period, and difficulty sleeping due to pain problems from two light strokes and a seizure. . . . A cervical spine series revealed only mild spondylosis, minimal degenerative loss of height of the C5-6 intervertebral disc space, and straightening of the usual lordosis (Exhibit B16F). Claimant is 46 years old. Degenerative disc disease such as Claimant has is evident in approximately 75 percent of individuals between ages 35 to 45. It is so common that it is almost a 'normal' part of our aging process. Disc degeneration is a natural consequence of aging. It is seen radiographically in about one out of five people in their twenties and in 100% of people by their sixties. *Available at*: http://www.back.com/faq-ddd.html." (R. 26).

[7] This HALLEX section is entitled "Writing the Decision," and the language quoted above is in a subdivision headed "Language and Style." The only citations to law are to sections 205(b)(1) and 1631(c)(3) of the Social Security Act, which direct the Commissioner to make findings of fact and decisions on applications for benefits. HALLEX I-2-8-25.

11 (N.D. Ga. Sept. 30, 2008). The Courts of Appeals which have addressed the issue agree that the HALLEX does not carry the force of law. See Moore v. Apfel, 216 F.3d 864, 868-69 (9th Cir. 2003)("The text of [the 'purpose' statement of the HALLEX] indicates that HALLEX is strictly an internal guidance tool, providing policy and procedural guidelines to ALJs and other staff members. As such, it does not prescribe substantive rules and therefore does not carry the force and effect of law. . . . Further evidence that this is a purely internal manual can be seen in the fact that HALLEX was not published in either the Federal Register or the Code of Federal Regulations, indicating that the manual was not promulgated in accordance with the procedural requirements imposed by Congress for the creation of binding regulations and was not intended to be binding.)(citation omitted); Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000)("[H]ALLEX does not carry the authority of law[.]"); Bordes v. Commissioner of Social Security, 235 Fed. Appx. 853 (3rd Cir. 2007)(unpublished opinion)("These POMS and HALLEX provisions do not aid Ms. Bordes, however, because they lack the force of law and create no judicially-enforceable rights").

In the Ninth Circuit, the HALLEX does not create judicially enforceable duties, and the court "will not review allegations of noncompliance with [its] provisions." Parra v. Astrue, 481 F.3d 742 (9th Cir. 2007), *cert. denied* 128 S.Ct. 1068 (2008)(citing Moore). The Third Circuit has held likewise. Bordes, *supra*. The Fifth Circuit, in contrast, holds that – even though the HALLEX "does not carry the authority of law" – the Commissioner's decision cannot stand if the violation of HALLEX resulted in prejudice to the claimant. Newton, 209 F.3d at 459; Shave v. Apfel, 238 F.3d 592, 596-97 (5th Cir. 2001)("This Circuit

has expressed a strong preference for requiring the social security administration to follow its own internal procedures. This Court requires, however, a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision.")(internal citation omitted).

The court concludes that violation of HALLEX provisions do not provide an independent basis for relief against the Commissioner.[8] Moore, 216 F.3d at 868-69; cf. Schweiker v. Hansen, 450 U.S. 785, 789 (1981)(holding that the Social Security Administration's claims manual is a handbook for internal use which "has no legal force and it does not bind the SSA"); Melvin v. Astrue, ___ F. Supp.2d ___, 2009 WL 321008 (E.D. N.C. Feb. 6, 2009)(holding that "[a]s an internal guidance tool, HALLEX lacks the force of law[,]" and citing Christensen v. Harris County, 529 U.S. 576, 587 (2000), a Fair Labor Standards Act case, for its "holding that 'agency interpretations contained in 'policy statements, agency manuals, and enforcement guidelines[] all . . . lack the force of law"); Winn ex rel N.G. v. Astrue, 2008 WL 4276605, 5 n. 5 (M.D. Fla. Sept. 17, 2008)(unpublished opinion)("[The HALLEX] is an internal guidance manual whose provisions lack the force and effect of law.")(citing Moore, 216 F.3d at 86-69). Accordingly, the ALJ's failure to abide by the HALLEX guidance for decision writing does not warrant

---

[8] In Mullis, the court "observe[d] that the Eleventh Circuit might follow the Fifth Circuit standard." 2008 WL 4452343 at 11 n. 13. However, the court also recognized that the Newton court's reliance on Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 9, 1981) – binding precedent in this circuit – to support its conclusion may have been misplaced. Mullis, 2008 WL 4452343 at 11 n. 13 (citing McCoy v. Barnhart, 309 F.Supp.2d 1281, 1289 (D. Kan. 2004) for its observation that the Fifth Circuit's reliance on Hall was misplaced because Hall involved a Social Security Ruling, not a HALLEX provision).

reversal of the Commissioner's decision.[9]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and a proper application of the law. Accordingly, it is due to be AFFIRMED. A separate judgment will be entered.

Done, this 31st day of March, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[9] Alternatively, the court concludes that plaintiff has failed to establish prejudice as a result of the violation. The court finds that the ALJ's determination regarding plaintiff's RFC is supported by substantial evidence, without consideration of the internet study cited by the ALJ. Plaintiff has not suggested that, if the ALJ had provided the study to her as required by the HALLEX, she could have produced any evidence to the contrary.